# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 10, 2014          Decided June 9, 2015

No. 13-7198

HOWARD TOWN CENTER DEVELOPER, LLC,
APPELLANT

v.

HOWARD UNIVERSITY,
APPELLEE

v.

CASTLEROCK PARTNERS, LLC,
APPELLANT

Consolidated with 14-7029

Appeals from the United States District Court
for the District of Columbia
(No. 1:13-cv-01075)

*Kenneth C. Smurzynski* argued the cause for appellants. With him on the briefs were *John E. Schmidtlein* and *Masha G. Hansford*.

*Timothy F. McCormack* argued the cause for appellee. With him on the brief was *Michelle M. McGeogh*.

Before: BROWN, *Circuit Judge*, and WILLIAMS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG

GINSBURG, *Senior Circuit Judge*: Howard University leased a parcel of land in Washington, D.C. to Howard Town Center Developer, LLC. After the Developer failed to make a rental payment of $1,475,000 on May 30, 2013, the University terminated the lease agreement. The Developer sued, and the district court entered a summary judgment in favor of the University. Because we agree with the Developer that there is a genuine dispute whether a rental payment was due on May 30, 2013, we vacate the judgment of the district court and remand this case for further proceedings in that court.

## I. Background

Howard University owns a "long-neglected" parcel of land in Washington, D.C. that it sought to transform into an upscale "mixed-use residential/retail development." In 2010 the University entered into several related agreements with Castlerock Partners, LLC, which later assigned its interest in the agreements to Howard Town Center Developer, LLC. Three of those agreements are relevant to this appeal: the Ground Lease, the Development Agreement, and the Amendment to the Development Agreement.

The Ground Lease provides that the University will lease the property to the Developer for 99 years. In exchange, the Developer will make rental payments of $525,000 on January 22, 2010 and of $1,475,000 on March 15, 2011, followed by periodic rental payments in an amount to be determined by a

formula specified in the lease. Section 16.2 of the Ground Lease describes the process by which the University may terminate the lease if the Developer fails to pay rent:

> Should Tenant at any time be in default with respect to any rental payments or other charges payable by Tenant under this Lease, and should such default continue for a period of ten (10) days after written notice from Landlord to Tenant … then Landlord may treat the occurrence … as a breach of this Lease (an "Event of Default"), and in addition to any or all other rights or remedies of Landlord under this Lease or as otherwise permitted by law, it shall be, at the option of Landlord

> …

> [t]he right of landlord to terminate this Lease and to declare the Lease term ended .…

> …

> [P]rior to exercising any right to terminate this Lease on account of any Event of Default, Landlord shall provide Tenant and each Leasehold Mortgagee with a written notice (in addition to any notice of default provided for in this Section 16.2 … ), specifying IN BOLD FACE CONSPICUOUS TYPE, that Landlord intends to terminate the Lease if the Event of Default is not cured within ten (10) days. Upon the expiration of such ten (10) day period, and if such Event of Default has not been cured, Landlord shall have the right, at its sole option, thereafter to elect to terminate this Lease ….

The Development Agreement outlines the plans for developing the parcel. It describes, among other things, the

type of buildings the Developer must construct on the property and the timeline for doing so.

The Amendment to the Development Agreement allocates the cost of cleaning up environmental toxins discovered on the site. It modifies the Ground Lease by directing the Developer to make the first two rental payments — of $525,000 and $1,475,000 — to an escrow account rather than to the University directly. The money in the escrow account will be used to satisfy the University's obligation to cover its share of the cost of cleaning up the toxins, and any remaining funds will be released to the University.

After signing these three agreements, the University and the Developer created an escrow account, and the Developer made the first rental payment of $525,000 into the account. The Developer did not, however, make the second rental payment of $1,475,000 by March 15, 2011 as required by the Ground Lease. The University extended the deadline for the second rental payment, but it remained concerned with the Developer's progress and demanded assurances that the Developer would stay on schedule. The Developer did not respond and, on September 26, 2011, the University advised the Developer it was in default under the Ground Lease and the Development Agreement. On February 3, 2012 the University again notified the Developer it was in default and the University would regard the Developer's failure to pay $1,475,000 within ten days as an "Event of Default" under the parties' agreements. On March 5, 2012 the University informed the Developer it intended to terminate the Ground Lease and the Development Agreement if the Developer did not cure the "Event of Default" within ten days.

In an effort to save the project, the parties returned to the negotiating table and drafted a Second Amendment to the Development Agreement. The proposed Second Amendment — which the parties never signed — provided the Developer would make the $1,475,000 rental payment by May 30, 2013.

Although the parties had not signed the Second Amendment to the Development Agreement, on April 6, 2012 they signed a Term Sheet, which includes the following provisions:

> The letters entitled "Notice of Default and Notice of Intent to Terminate" dated February 3, 2012 and again on March 6, 2012 are hereby withdrawn. The defaults related to the timetable for development will be revised and documented in amendments to the Development Agreement and Ground lease. The timetable for cure of the monetary default is defined herein.
>
> …
>
> The new timetable for development is as follows:
>
> 1) Execute this Term Sheet: April 6, 2012, or at such later time as both parties execute the Term Sheet, which shall be deemed to be the Effective Date.
>
> 2) Execute Ground Lease Amendment and [Second] Development Agreement Amendment by Monday, April 30, 2012.
>
> 3) Execute amendment to Escrow agreement such that $525,000 held in escrow for the purposes of environmental remediation will be released upon execution of this Term Sheet.

4) Payment of past due ground rent in the amount of $1,475,000 shall be as follows: (a) no later than ten (10) days after execution of this Term Sheet, a payment of $100,000 will be made, and (b) the balance of $1,375,000 will be paid no later than ninety (90) days after the execution of the Ground Lease and Development Agreement Amendments.

Two of the obligations set forth in the Term Sheet remain unfulfilled: the Developer did not make either rental payment, and the parties did not execute the Second Amendment to the Development Agreement. The parties did, however, terminate the escrow agreement, thereby releasing $525,000 to the University.

The parties continued to negotiate the terms of the Second Amendment to the Development Agreement into early 2013. On February 1, 2013 the University advised the Developer it would "take no further action in support of the current developer" unless three conditions were satisfied, one of which was that a "rental payment of $1.4 million has been made to Howard University by May 30, 2013." On March 27, 2013 the University sent the Developer a revised draft of the Second Amendment to the Development Agreement. On April 1, 2013 the Developer proposed two "non-negotiable" revisions to the proposed Second Amendment. On April 15, 2013 the Developer sent the University a letter warning "that the $1,475,000 ground lease payment to be tendered on or before May 30, 2013 is now a potential issue." The Developer was concerned about applications pending before the D.C. Historic Preservation Board to classify as historic landmarks the vacant buildings on the property. The University replied that the applications did not affect the Developer's obligations. On May 23, 2013 the Developer informed the University it would not make any rental

payments until the applications for landmark designation had been resolved.

On June 3, 2013 the University sent the Developer a letter with the headers "Notice of Default" and "Notice of Intent to Terminate." The letter, which was "issued pursuant to Section 16.2 of the Ground Lease," advised the Developer it "is in default of the Ground Lease by reason of its failure to pay to the University the sum of $1,475,000.00 due December 8, 2011 … which due date was extended by the University through May 30, 2013." The University further warned it "intends to terminate the Ground Lease if that failure is not cured by the payment in full of the sum of $1,475,000.00 by the Developer to the University within ten (10) days after this notice." Eleven days later, on June 14, 2013, the University informed the Developer "that the University hereby terminates the Ground Lease and declares the Ground Lease term ended." On June 19, 2013 the Developer, in an effort to cure the alleged breach, created a new escrow account and deposited $1,475,000 into that account. The University did not enter an escrow agreement with the Developer and did not have access to the funds in the account.

On July 15, 2013 the Developer filed a complaint alleging, among other things, that the University improperly terminated the Ground Lease. The University filed a counterclaim seeking the $1,475,000 rental payment. The University moved for summary judgment, and the district court granted the motion. The court concluded the University properly terminated the Ground Lease and awarded the University $1,475,000 in damages.

8

## II. Analysis

The Developer contends the district court erred in deciding that the $1,475,000 rental payment was due on May 30, 2013: It would have been required to pay $1,475,000 by that date under the Second Amendment to the Development Agreement, but the parties never executed the Second Amendment. The University argues the Developer was nevertheless obligated to make the $1,475,000 payment by May 30, 2013 because the Developer confirmed in an email, a letter, and a telephone conversation that it would do so. The district court agreed with the University, saying it decided to "follow the understanding of the parties as shown in their correspondence that the $1,475,000 payment was due no later than May 30, 2013, as contemplated in the plaintiff's requested Second Amendment[] to the Development Agreement." *Howard Town Center Developer, LLC v. Howard Univ.*, 7 F. Supp. 3d 64, 74 (D.D.C. 2013).

Under D.C. law — which governs this dispute pursuant to a choice-of-law provision in the Ground Lease — "[f]or a contract to be enforceable, the parties must (1) express an intent to be bound, (2) agree to all material terms, and (3) assume mutual obligations." *Dyer v. Bilaal*, 983 A.2d 349, 356 (D.C. 2009). With respect to the first element, "the ultimate issue is whether, by their choice of language … [the parties] *objectively* manifested a mutual intent to be bound contractually." *1836 S St. Tenants Ass'n v. Estate of B. Battle*, 965 A.2d 832, 837 (D.C. 2009). Because we are reviewing a summary judgment in favor of the University, we must view all facts in the light most favorable to the Developer. *See Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

In the email, which is dated April 1, 2013, the Developer described the payment term in the proposed Second Amendment to the Development Agreement, but it did not manifest its intent to be bound by the term regardless whether the parties executed the Second Amendment. The Developer explained that "the only monetary amount owed pursuant to Paragraph 11 of the Second Amendment is the initial Ground Lease payment of $1,475,000 on or before May 30, 2013." It also mentioned that if the Developer did not deliver the payment by May 30, 2013, then "the agreement automatically terminates" and the University is "free to pursue any and all legal remedies for non-payment." As the Developer explains, however, these statements were made in the course of negotiating the terms of the Second Amendment. The Developer began the email by noting it was "still contemplating a response to the University's response to [the Developer's] last ground lease revisions." It then identified the two proposed revisions to the Second Amendment that it considered "non-negotiable." Far from expressing its intent to be bound, the Developer conveyed that it would not agree to the terms of the Second Amendment — one of which is that the Developer pay $1,475,000 to the University by May 30, 2013 — unless the University agreed to the Developer's proposed revisions.

In its letter, which is dated April 15, 2013, the Developer informed the University "that the $1,475,000 ground lease payment to be tendered on or before May 30, 2013 is now a potential issue" because of the applications pending before the D.C. Historic Preservation Board. The Developer then advised that, although it has "every intent to make that ground lease payment by the date specified," it is "discomforted by the notion that a material change to the development program, which has been beyond [the Developer's] control, will surely impact the economics of this project." Read in isolation,

these statements suggest the Developer had already committed to make a rental payment by May 30, 2013. We must bear in mind, however, that the statements were made in the course of negotiating the terms of the Second Amendment. *See Simplicio v. Nat'l Sci. Personnel Bureau, Inc.*, 180 A.2d 500, 502 (D.C. 1962) ("The language of the letter, taken as a whole, clearly indicates that the appellant did not intend to be bound to do so until a written agreement had been signed by both sides covering acceptable terms…. The letter was merely a part of the preliminary negotiations looking toward the execution of a contract in writing."). Furthermore, as a practical matter, it is unlikely the Developer would spend months negotiating the fine points of the Second Amendment, and then suddenly promise to tender the $1,475,000 payment without either insisting the University agree to its "non-negotiable" concessions or at least noting that it was no longer insisting upon them.

At oral argument the University claimed the Developer also agreed to pay $1,475,000 by May 30, 2013 during their telephone conversation on February 1, 2013. For its part, the Developer says there "was no discussion … pertaining to payment of the $1,475,000" during the call. We are in no position to weigh the credibility of the parties, and, in any event, the Ground Lease and the Development Agreement by their terms may not be amended except by a written agreement executed by both parties.

Viewing the facts in the light most favorable to the Developer, we cannot conclude the Developer agreed to pay $1,475,000 by May 30, 2013. A reasonable juror might find the parties contemplated that the Developer would be bound by the May 30, 2013 deadline only if the parties executed the Second Amendment to the Development Agreement. The district court erred by deciding as a matter of law that the

Developer, in its correspondence with the University, made a legally enforceable promise to tender the payment by that date.

The University next argues the Developer conceded in its complaint that it agreed to pay $1,475,000 by May 30, 2013. The statements to which the University refers were made in the course of describing the unsigned Second Amendment to the Development Agreement. For example, the complaint avers

> the parties discussed making certain modifications to the Lease and Agreement ("Second Amendment"). During these discussions, [the Developer] and [the University] agreed that [the Developer] would not be obligated to tender the Payment called for under the Amendment until May 30, 2013.

A few sentences later, the complaint adds that "despite [the Developer's] above efforts and repeated requests to [the University], [the University] failed and refused to execute the Second Amendment." Taken together, these statements explain that the Developer would have been required to pay $1,475,000 by May 30, 2013 under the proposed Second Amendment, but they do not imply the Developer promised to make the payment regardless whether the parties executed the Second Amendment.

The University also contends the Developer breached the parties' agreement even if the Developer did not promise to pay $1,475,000 by May 30, 2013. If the Second Amendment does not dictate the deadline for the $1,475,000 payment, then, according to the University, the Ground Lease provides the operative deadline. Recall the Ground Lease obligates the Developer to make the payment by March 15, 2011, and,

when the Developer failed to do so, the University notified the Developer in February and March of 2012 that it intended to terminate the Ground Lease.

The parties addressed these matters in the Term Sheet, which they executed on April 6, 2012. The Term Sheet provides that "[t]he letters entitled 'Notice of Default and Notice of Intent to Terminate' dated February 3, 2012 and again on March 6, 2012 are hereby withdrawn." It then sets forth a revised schedule for the $1,475,000 rental payment:

> Payment of past due ground rent in the amount of $1,475,000 shall be as follows: (a) no later than ten (10) days after execution of this Term Sheet, a payment of $100,000 will be made, and (b) the balance of $1,375,000 will be paid no later than ninety (90) days after the execution of the Ground Lease and [Second] Development Agreement Amendments.

The Developer argues the Term Sheet amended the Ground Lease and therefore supplies the operative deadlines for the rental payments. Because the parties never executed the Second Amendment to the Development Agreement, the deadline set forth in the Term Sheet for the payment of $1,375,000, viz., 90 days after the execution of the Second Amendment, has not yet arrived.

The University responds that "[e]ven if the Term Sheet were considered a binding and enforceable contract, the Developer breached the Term Sheet" by not making a $100,000 payment within ten days after executing the Term Sheet. Appellee's Br. at 28. Although the Developer acknowledges it did not make the $100,000 payment, it argues failure to do so was not a breach of the Ground Lease. The Ground Lease provides that "[s]hould Tenant at any time

be in default with respect to any rental payments … and should such default continue for a period of ten (10) days after written notice from Landlord to Tenant … then Landlord may treat the occurrence … as a breach of this Lease (an 'Event of Default')." If the Term Sheet is an enforceable contract that modifies the Ground Lease, then the Developer is indeed "in default with respect to" its promise to pay $100,000 within ten days of executing the Term Sheet. The default is not "a breach of th[e] Lease," however, because the University did not provide written notice that the Developer's failure to pay $100,000 within ten days of executing the Term Sheet constitutes a default. The notice issued by the University on June 3, 2013 alleges the Developer defaulted by failing to pay $1,475,000 on May 30, 2013, but it does not mention the obligation to pay $100,000 within ten days after the parties executed the Term Sheet.

Furthermore, the University did not properly terminate the Ground Lease even if the letter it issued on June 3, 2013 is construed as a notice that the Developer was in default of the lease as a result of its failure to pay $100,000 within ten days after the parties executed the Term Sheet. Section 16.2 of the Ground Lease provides the University must send two notices to the Developer before it may terminate the lease. First, the University must issue a notice advising the Developer it is "in default with respect to" a rental payment. If the Developer does not cure the default within ten days, then the University may treat the default "as a breach of th[e] Lease" (i.e., an "Event of Default"). After an "Event of Default" occurs, the University may terminate the Ground Lease by issuing a second notice and waiting an additional ten days:

> [P]rior to exercising any right to terminate this Lease on account of any Event of Default, Landlord shall provide Tenant … with a written notice (in addition to any notice

of default provided for in this Section 16.2 … ), specifying … that Landlord intends to terminate the Lease if the Event of Default is not cured within ten (10) days.

The University did not follow this two-step process when it purported to terminate the Ground Lease in June 2013. Instead, the University sent the Developer a combined "Notice of Default" and "Notice of Intent to Terminate" on June 3 and then terminated the lease on June 14.

The University argues, in the alternative, that the Term Sheet "simply established an agreement to agree" and "did not modify the Ground Lease's requirement that the rent be paid no later than March 15, 2011." Appellee's Br. at 26. The district court posited it "need not determine whether the Term Sheet was merely an 'agreement to agree' or itself a stand-alone contract, since neither party purports to hold the other to the terms of the Term Sheet in the instant action." *Howard Town Center Developer*, 7 F. Supp. 3d at 73. It is true that the Developer's primary argument before the district court did not rely upon the Term Sheet; indeed, at one point, the Developer went so far as to urge the district court to disregard the document altogether. *See* Pl.'s Opp'n to Mot. for Summ. J. at 7 & n.8. In an alternative argument, however, the Developer explained the effect of the Term Sheet upon the deadline for the rental payment:

> If the Term Sheet controls as once intimated by [the University] … then the Default Notice [delivered by the University on June 3, 2013] was woefully improper. The Term Sheet stated that [the Developer] was to pay $100,000 to [the University] within ten (10) days of execution of the Term Sheet and the remaining $1,375,000 Payment was not due until ninety (90) days

> after execution of the Second Amendment documents…. Since the Second Amendment documents to this day have not been executed, the Payment has yet to become due.  Absent a due date, it is axiomatic that [the University] could not issue a default notice based on an event that has yet to occur.  [The University] never issued a default notice for the non-payment of the initial $100,000 because the parties were continuing to work together to address a myriad of issues, including the timing [of the] payment.

*Id.* at 21 n.16.  The Developer went on to reiterate that "[i]f the Term Sheet controls, then as argued earlier, the time to cure has not even begun."  *Id.* at 24 n.17.

The district court offered a second reason for declining to resolve whether the Term Sheet is an unenforceable "agreement to agree" — as the University would have it — or a valid contract that governs the deadline for the $1,475,000 rental payment, as the Developer contends.  The court rejected the Developer's alternative argument on the ground that it "is specious reasoning to concede, on the one hand, that the Term Sheet is not binding … and, on the other hand, that the Term Sheet worked to delay indefinitely the due date of the second rent payment….  The plaintiff cannot have this both ways."  *Howard Town Center Developer*, 7 F. Supp. 3d at 73.  A plaintiff may, however, logically present inconsistent arguments in the alternative, which is all the Developer did here.  Nothing could be more common in litigation.

We leave it to the district court on remand to determine in the first instance whether the Term Sheet is a legally enforceable contract under D.C. law and, if so, how the Term Sheet affects both the Developer's claim that the University improperly terminated the Ground Lease and the University's

counterclaim that it is entitled to collect $1,475,000. The Developer also raises three other arguments: (1) it was impossible to make the $1,475,000 rental payment in accordance with the terms of the Ground Lease because the parties had terminated the escrow account designated to receive the payment; (2) the Developer cured the alleged breach by depositing $1,475,000 into an escrow account on June 19, 2013; and (3) the district court erred by allowing the University to terminate the lease in addition to requiring the Developer to pay rent. We do not reach these three arguments because they are not material unless the district court determines on remand that the Developer was obligated to make a rental payment on or before May 30, 2013.

## III.  Conclusion

There is a genuine dispute whether the Developer was required to pay the University $1,475,000 by May 30, 2013, and, therefore, whether the University was entitled to terminate the Ground Lease and to collect $1,475,000 in damages. The judgment of the district court is, therefore, vacated and the matter is remanded to that court for further proceedings consistent with this opinion.

*So ordered.*